**LI'L' RED BARN, INC.**

v.

**The RED BARN SYSTEM, INC.**

Civ. No. 4810.

United States District Court,
N. D. Indiana,
Hammond Division.

Oct. 21, 1970.

Tinkham, Beckman, Kelly & Singleton, Hammond, Ind., and Henderson & Strom, Des Moines, Iowa, for plaintiff.

Charles Bomberger, Hammond, Ind., Gordon Daisley, Washington, D. C., and

Thomas C. Wilson, Fort Lauderdale, Fla., for defendant.

## OPINION

BEAMER, District Judge.

This is an action for trademark infringement, unfair competition and breach of contract.[1] The Court has jurisdiction over the first two claims by virtue of 28 U.S.C. § 1338(a) and (b). Jurisdiction over the third is based on diversity of citizenship.

Plaintiff, Li'l' Red Barn, Inc. ("LRB"), is an Iowa corporation engaged in franchising and operating "convenience" food stores.[2] It was incorporated on March 19, 1962, and opened its first store on December 21, 1962. Since that time, plaintiff and its franchisees have operated a total of twenty-six outlets,[3] eleven of which were still in operation at the end of 1969, in the states of Iowa, Indiana, Illinois and Colorado.

Defendant, The Red Barn System, Inc. ("RBS"), is an Ohio Corporation engaged in franchising and operating drive-in restaurants. A predecessor (which the parties have agreed may be treated as the same entity for the purposes of this action) was incorporated on May 16, 1961. The first Red Barn restaurant was opened the following September; and by the end of 1969, there were 265 Red Barn restaurants and 13 Red Barn "Chicken Pantries" in 24 states.

Plaintiff is the owner of registered trademark 652,818 (the "Eichler mark"), issued by the United States Patent Office to Edwin H. Eichler on October 8, 1957, and assigned to plaintiff on November 14, 1962. The mark consists in the words "Little Red Barn" in white, superimposed on a frontal view of a red barn with a weathervane on top. The Eichler mark is registered for "various items of food—namely, pork sausage, summer sausage, sliced bacon, small barbecued chicken, whole wheat bread, cheddar cheese, molasses taffy, * * * trout pate, [and] pre-cooked wild rice * * * in Class 46." [4]

Defendant is the owner of registered service mark 772,953, issued on July 7, 1964. The mark consists in the words "The RED BARN" in red, and is registered for the services of "promoting the establishment of a chain of franchised drive-in restaurants, and advising, instructing, and financially assisting the operators of such restaurants, in Class 100." [5] Defendant subsequently applied for registration of three additional marks,[6] but plaintiff opposed, and the opposition proceeding was suspended by the Patent Office until the resolution of this action.

The complaint contains four counts. The first charges infringement of the Eichler mark. The second and third charge various forms of unfair competition, and the fourth claims breach of

---

1. As ancillary relief, each party demands the cancellation of the other's trademark registration. See 15 U.S.C. § 1119. However, the Court's jurisdiction depends on the primary claims described above.

2. Convenience stores are a relatively recent marketing development. They can best be described as drive-in food stores, specializing in a limited line of high-volume grocery and beverage items, and emphasizing fast service.

3. The twenty-six were more or less equally divided between full-sized convenience stores and smaller "satellite units," associated with automobile service stations. Ten of the eleven outlets still in operation are full-sized stores.

4. As originally issued, the mark also covered grape jelly and fresh apples, but Eichler subsequently amended the registration to delete those items. "Class 46" is the Patent Office classification for "foods and ingredients of foods." 37 C.F.R. § 6.1.

5. Class 100 covers "miscellaneous" services. 37 C.F.R. § 6.1.

6. App. 210,048 is for the words "RED BARN" as trademark. App. 210,049 is for the same words as a service mark for restaurant services. App. 218,481 is for the words "RED BARN" and Design (words superimposed on frontal view of barn with outline of rising sun), as another mark for restaurant services.

contract. Defendant has filed two counterclaims, the first alleging infringement of its registered service mark, and the second alleging that the Eichler registration is invalid and demanding its cancellation. At the end of its evidence, plaintiff asked leave to amend by adding a fifth count charging defendant with fraud in obtaining its service mark registration. The motion was taken under advisement, and will be discussed below.

## Count I: Infringement of Registered Trademark

In Count I of the complaint, plaintiff charges defendant with statutory infringement. In essence, the claim is that defendant has used "colorable imitations" of the Eichler mark in commerce in such a way as to create a likelihood of confusion. See 15 U.S.C. § 1114. RBS's defense consists in two main contentions: first, that the Eichler registration is invalid; and second, that there was no infringement within the meaning of the statute.

The claim of invalidity is based on three distinct arguments: first, that the registration was void *ab initio* because Eichler never made any bona fide use of his mark in interstate commerce prior to registration; second, that an affidavit of continued use filed with the Patent Office by Eichler in 1962 was false and fraudulent; and third, that the mark has been abandoned.

### 1. Initial Interstate Use

 To be registrable under the Lanham Act, 15 U.S.C. § 1051 et seq., a trademark has to be used in interstate commerce. *Cf.* 15 U.S.C. § 1051. A single instance of interstate use is sufficient if the accompanying circumstances indicate that the applicant intended to continue that use. Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 542 (2d Cir. 1965); Worden v. Cannaliato, 52 App.D.C. 254, 285 F. 988, 990 (1923).

There can be no question that the Eichler mark was used in interstate commerce prior to its registration. On May 29, 1956, Eichler shipped a package containing a sample of each item listed in his trademark application from his place of business in Dundee, Illinois, to the home of Carl J. Much, Sr., in Berlin, Wisconsin. Each item bore a "Little Red Barn" label, and Much paid a fair price with his own money.

However, defendant contends that the sale to Much was not a "bona fide business transaction," and that the accompanying circumstances failed to demonstrate any intent on Eichler's part to continue using the mark in interstate commerce. The resolution of those issues requires some background information.

For some years prior to 1956, Eichler had been the proprietor of a restaurant in Dundee, Illinois, called the Milk Pail. The restaurant was located on the grounds of a farm and game preserve called the Fin 'n' Feather Farm. In conjunction with the restaurant, Eichler operated a food store, which for many years had been selling various food items, both directly and by mail, under the Fin 'n' Feather label.

At some unknown time, Eichler conceived the idea of selling food products through a chain of stores resembling miniature red barns. As a preliminary step, he had a stock of "Little Red Barn" labels printed; and although the evidence on this point is inconclusive, it appears that he applied some of them to Fin 'n' Feather products.

Being conscious of the interstate use requirement for federal trademark protection, Eichler "quite likely" [7] solicited the order from Much, the father of a business associate at Fin 'n' Feather Farm, for the express purpose of establishing a basis for federal registration.

The evidence concerning Eichler's subsequent use of the mark is unclear, but it appears that at least some of the products listed in the registration were regu-

---

7. This was stipulated by the parties.

larly displayed at the Milk Pail store under the Little Red Barn label. Louis Westheimer, a business associate of Eichler's, testified that he visited the Milk Pail frequently between 1955 and 1962, and recalled seeing Little Red Barn preserves, sausage, bacon and bread there. Plaintiff's former vice-president testified that on the two occasions in 1962 when he visited the Milk Pail, he saw Little Red Barn bakery goods and processed meats on display. One of defendant's own founders, W. James Kirst, recalled seeing Little Red Barn jelly on display at the Milk Pail in 1962.

Eichler himself believed that at least some of the products were kept on display at the Milk Pail. He recalled sending out numerous samples of Little Red Barn foods, in connection with his efforts to find financial and promotional backing for his idea of establishing a chain of stores. Westheimer testified that Eichler frequently sent him samples, and that he sometimes ordered products on his own, particularly "coffee can bread," which he thought bore the Little Red Barn Label. In 1962, when he assigned his mark to LRB, Eichler had a substantial stock of Little Red Barn labels on hand for each item listed in the registration.

On the other hand, Eichler was unable to produce any documentary evidence of sales in the ordinary course of business subsequent to the transaction with Much; [8] and it seems that in 1962, at least, he had no substantial inventory of labeled products, since his agreement with plaintiff required him to deliver "any stock in trade," and in fact he delivered only one sample of each product. Eichler's testimony was vague from beginning to end, and the memories of other witnesses were equally poor.

On the basis of those facts, defendant contends that the sale to Much was not a "bona fide business transaction," and that as a result, the interstate use requirement was not satisfied. In support of that position, defendant cites Phillips v. Hudnut, 49 App.D.C. 247, 263 F. 643 (1920). There the facts were as follows:

* * * Hudnut adopted the mark in question in September, 1914, and used it continuously thereafter. Phillips claims May, 1914, as the time he commenced the use of the mark. In that month he had no established place of business, but made some sample boxes * * *, placed upon them the mark here involved, and then forwarded them from New York, through the house for which he was then working, to three dealers in goods of that character, one in Texas, one in Philadelphia, and one in New Orleans. The boxes were sent without previous request by the consignees, and the price paid for each was 5 cents, the usual sale price of such an article being about 50 cents. No other use of the mark was made by him until 1916. [263 F. at 644.]

On the basis of those facts, the Patent Office found that the 1914 transaction was not "a bona fide business transaction—was not doing business on Phillips' part, and was a mere laying basis for the filing of his application for registration, and created no trade-mark rights in Phillips." 263 F. at 644. The court agreed.

However, Phillips v. Hudnut has to be read in the light of more recent decisions involving similar facts. In Montgomery Ward & Co., Inc. v. Sears, Roebuck & Co., 49 F.2d 842, 18 CCPA 1386 (1931), it appeared that both companies had independently conceived of the same name for a variety of non-fouling ammunition at roughly the same time. Sears's first sale was to a Dr. Marr, and Montgomery Ward challenged it under Phillips v. Hudnut. The court made the following comments:

It is pointed out that Dr. Marr, in fact, made the order at the solicitation

---

8. There were two documented sales in 1962, but one was to Much and the other to Westheimer; and both were made immediately prior to the filing of Eichler's affidavit of continued use (*cf.* infra). Hence they have little probative force.

of a member of the Sears, Roebuck & Co. concern; that he did not use the cartridges; and the contention is that the whole transaction was brought about in an effort to meet the interstate commerce requirement of the registration law, and appellant cites the case of Phillips v. Hudnut * * *.

It does not seem to us that the instant case is on all fours with the last-named case. The facts are different. There is no question of there having been a sale in the instant case. Dr. Marr ordered the cartridges and paid the regular price for them with his own money. It is not material how he used them, or whether he used them at all. It may be that the transaction was one brought about by appellee's desire to meet the requirements of the law, but this does not destroy its rights, if, in fact it did meet these requirements. [49 F.2d at 844.]

And in Fort Howard Paper Co. v. Kimberly-Clark Corp., 390 F.2d 1015, 55 CCPA 947 (1968), where the initial sale was arranged by Kimberly-Clark's legal department for the express purpose of obtaining federal protection, and was followed by an eighteen-month hiatus while the company did marketing and advertising research and prepared for large-scale production, the court affirmed a Patent Office decision that "although the initial sale was deliberately made for federal registration purposes, this fact 'is not damning per se' where the record shows there was an intent to continue to use the mark, and that such use was in fact continued." 390 F.2d at 1017.

■■ The present case is much closer to *Montgomery Ward* than Phillips v. Hudnut. Here, as in *Montgomery Ward*, the fact of the sale itself is unquestioned,

and the buyer gave fair consideration. The sale appears on its face to have been something more than a mere sham; and if so, the fact that it may have been made primarily for federal registration purposes is immaterial, so long as Eichler intended to continue using the mark in commerce.[9]

■■ If it were plaintiff's burden to establish that intent, the Court would be constrained to rule in favor of the defendant. As a practical matter, a person's intent at a given point in time can usually be established only by evidence of what occurred thereafter; and the evidence of subsequent use here was sparse indeed. However, 15 U.S.C. § 1057(b) provides that a certificate of registration is "prima facie evidence" of the validity of the registration and the registrant's ownership of the mark. A fortiori, it also constitutes prima facie evidence that the registrant had the requisite intent to begin with. The burden here was on the defendant to show facts inconsistent with that intent, and the Court is of the opinion that defendant failed to meet that burden.

The only evidence in the record is positive: various people testified that they saw Little Red Barn products on display at the Milk Pail store (which had a substantial out-of-state clientele) at various times between 1956 and 1962. Eichler himself testified in his deposition that he recalled selling them there, and that he made substantial efforts towards setting up a chain of stores, although that never worked out. Defendant points to the deficiencies of that evidence, and the Court is fully conscious of them. Substantial periods are unaccounted for, and most of plaintiff's evidence was vague and undocumented. However, the burden was

9. In its brief, defendant contends that in *Fort Howard, supra*, the court imposed two distinct requirements: intent to continue using the mark, and continued use in fact. This Court does not read *Fort Howard* as requiring the second, except as evidence of the first. Other cases treat intent as the sole criterion. *Cf.* Maternally Yours, Inc. v. Your Maternity Shop, Inc., *supra;* Worden v. Cannaliato, *supra.* This Court concurs. Nonuse may be evidence of abandonment, but it should not be regarded as retroactively infecting the registration itself, if the requisite intent was present at the time of the transaction relied on for registration.

on the defendant, and defendant introduced no evidence at all.[10]

■ Consequently, despite the unsatisfactory evidence on the point, the Court finds that the sale to Much on May 29, 1965, was a bona fide commercial transaction; and that at the time of the sale, Eichler intended to continue using his mark in interstate commerce. The Eichler registration was not void *ab initio*.

## 2. Affidavit of Continued Use

15 U.S.C. § 1058 provides that:

> * * * the registration of any mark under the provisions of this chapter shall be canceled by the Commissioner at the end of six years following its date, unless within one year next preceding the expiration of such six years the registrant shall file in the Patent Office an affidavit showing that said mark is still in use or showing that its nonuse is due to special circumstances which excuse such nonuse and is not due to any intention to abandon the mark.

In order to avoid the application of that section, and to obtain incontestability under 15 U.S.C. § 1065, Eichler filed an affidavit with the Patent Office on October 23, 1962, stating, *inter alia,*

> that the mark described in [the Eichler] registration has been in continuous use in commerce among the several states of the United States for five consecutive years, from October 8, 1957 to October 8, 1962, subsequent to the date of registration set forth above, on or in connection with the goods set forth above and stated in said registration; that said mark is still in use by registrant in commerce among the several states of the United States and is now being used on tags or labels, applied to the containers for the goods or affixed to the goods, of the type hereto attached. * * *

Attached to the affidavit were labels for Little Red Barn summer sausage, bacon, whole wheat bread, molasses "taffey" (*sic*), cheddar cheese and grape jelly. Defendant contends that the affidavit has been shown to be false, since "there is no convincing documented evidence of any interstate shipments" between 1957 and 1962; and even if all the verbal evidence is taken as true, plaintiff has still failed to establish anything more than a series of isolated transactions—not the "continuous" use required by law.

Initially, it should be noted that the Court cannot accept defendant's factual position. If the verbal testimony is believed—and it stands uncontradicted—it might reasonably be inferred that from 1957 to 1962, Little Red Barn products were continuously on sale at the store attached to the Milk Pail restaurant. Since the evidence indicated that the Milk Pail store enjoyed a substantial out-of-state business, placing the trademarked products on sale there would have constituted use of the mark in interstate commerce.

■■ But in any event, defendant's argument appears to be based on the presumption that plaintiff was under a burden to establish the truth of the affidavit. That presumption is incorrect. The burden of proving fraud is on the party alleging it; and defendant's evidence, consisting as it did almost entirely in attempts to limit and discredit evidence which plaintiff was never under any obligation to produce in the first place, fell far short of the "clear and satisfactory" showing required to establish fraud on an officer of the government. *See* Lalone v. United States, 164 U.S. 255, 257–258, 17 S.Ct. 74, 41 L.Ed. 425 (1896). The Court therefore finds that the affidavit of continued use filed by Eichler on October 23, 1962 was not fraudulent; and that the Eichler registration was not invalidated by its filing.

---

10. For reasons unknown to the Court, both parties were content to rely on Eichler's deposition, which was vague and inconclusive, when the best testimony would obviously have been Eichler's own testimony on the witness stand.

### 3. Abandonment

15 U.S.C. § 1127 provides, in pertinent part, as follows:

A mark shall be deemed to be 'abandoned'—

(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

(b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin.

Defendant claims that the Eichler registration was abandoned in three distinct ways: first, by Eichler's own nonuse; second, by an invalid reassignment from plaintiff to Eichler; and third, by plaintiff's nonuse.

As for the first claim, the Court is of the opinion, as stated above, that defendant has failed to establish nonuse by Eichler. Moreover, if anything is clear from Eichler's deposition, it is that Eichler never had any intention of abandoning his mark. Whatever use he made of it in fact, he clearly had every intention of establishing a chain of Little Red Barn stores if he could get the necessary backing. He had an artist make a rendering of a proposed store building, traveled extensively, and sent out numerous samples in an attempt to obtain that backing. The Court is unable to find either nonuse or intent to abandon.

Defendant's second claim is based on an unrecorded reassignment delivered to Eichler as a security device when he assigned his mark to plaintiff. The contention is that although the reassignment purported to make a present transfer of good will to Eichler, no good will was in fact transferred; and as a result, the purported reassignment was an invalid attempt at an assignment in gross, which conveys no rights to the assignee and constitutes abandonment by the assignor.

First of all, the Court seriously doubts that the reassignment amounted to an assignment in gross. Although the document itself purported to be a present assignment, dated November 14, 1962 (the same date as the assignment from Eichler to plaintiff), Eichler's rights were significantly restricted by the terms of a contract of sale executed that same day, which contained the following provisions:

\* \* \* this Assignee shall re-assign all his rights in the registered trademark, identified hereinabove, to Assignor *for purposes hereinafter set forth.*

4. Assignor agrees to hold said reassignment \* \* \* and not to record same unless Assignee is in default for a period of not less than thirty (30) days. \* \* \* *In the event of such a default,* the parties hereto agree that this Agreement shall thereby automatically be terminated, the Assignor shall *then* become the sole owner of said trademark registration, he shall have the right to immediately file same in the Patent Office for recording as evidence of his title. \* \* \* Should Assignee make the payments \* \* \* as provided \* \* \*, he [Assignor] shall upon receipt of the final payment return to the Assignee the re-assignment delivered to him under the terms of par. 3 herein and thereby Assignor shall have no further rights under this contract or otherwise in said registered trademark.

5. Assignee shall not and he agrees not to sell, assign or otherwise transfer any right, title or interest in the registered trademark which is the subject of this Agreement until all sums are paid. \* \* \* [emphasis added].

In determining whether or not an assignment has been made, the question is one of intent. The wording of the contract here demonstrates clearly that neither of the parties intended the reassignment to have any immediate legal effect. The reassignment was condition-

al. It was intended to take effect only on the occurrence of a future event— plaintiff's default in performing the terms of the purchase agreement.

In the opinion of the Court, the transaction between Eichler and plaintiff amounted simply to a valid assignment for good consideration, secured by the plaintiff's agreement to reassign in the event of default. The contemporaneous delivery of an executed reassignment was merely a means of assuring Eichler that plaintiff would perform its end of the agreement. And the rule is well established that a mere agreement for the future assignment of a trademark is not an assignment of either the mark itself or the good will attached to it. 87 C.J.S. Trade-Marks, Trade-Names, and Unfair Competition § 173, p. 507.

But even if defendant's arguments were accepted, and the reassignment treated as an invalid assignment in gross, that fact alone would not compel a finding of abandonment. Defendant contends that assignment in gross constitutes abandonment per se; but in every case cited in support of that proposition, the assignor stopped using his mark after attempting to assign it and had no intention of resuming. In other words, the statutory elements of abandonment were present. Here, however, the evidence is clear that LRB continued using the mark after the reassignment. Under those circumstances, no matter how the reassignment is characterized, it could not have constituted abandonment.

Finally, defendant maintains that after the assignment, plaintiff itself abandoned the Eichler mark. Again, a certain amount of background information is required. From its inception LRB used a mark consisting in the words "THE LI'L' RED BARN" in white, superimposed on a frontal view of a somewhat stylized red barn. Aside from the words themselves, the main differences between that mark and Eichler's were that (1) the barns were shaped differently, (2) LRB's was somewhat more detailed, and (3)

LRB's had a rooster perched on the weathervane.

After the assignment, plaintiff used its own mark and Eichler's interchangeably. When the stock of labels delivered by Eichler ran out, plaintiff had twelve thousand more printed, along with ten thousand bread tags. The new labels and tags were for bread, sausage, and possibly some additional products; and the only difference between them and the ones delivered by Eichler was the substitution of plaintiff's name for Eichler's in the space provided for the name of the distributor.

The Eichler mark was used extensively during 1963, but only periodically thereafter; and it appears to have fallen into disuse in 1966. After that date, the only mark used by plaintiff was its own. Defendant argues that this constituted abandonment of the Eichler mark. Plaintiff's response is that since it regarded its own mark as substantially identical to Eichler's there was never any intent to abandon, and therefore there was no abandonment under the statute. The Court concurs.

Despite the differences noted above, plaintiff's mark and Eichler's are quite similar in appearance. The dominant features of both are the words "Little (albeit written out in the one case and abbreviated in the other) Red Barn" in white, and the outline of a red barn. It can reasonably be inferred that the obvious similarity was what motivated plaintiff to purchase the Eichler mark in the first place. Hugh Fowler, an advertising executive retained at one time by a prospective LRB franchisee to give promotional advice, testified that in his professional opinion, there was nothing more than a "subtle difference in style" between the two marks, and a casual customer would not be conscious of it.

While a mark can obviously be "modified" out of existence, minor changes in a registered mark do not constitute abandonment. The law seems

clear that as long as the new mark is closely related to the old, the old mark's registration protects the new one as well. In Proxite Products, Inc. v. Bonnie Brite Products Corp., 206 F.Supp. 511 (S.D.N.Y.1962), plaintiff was the manufacturer of a line of household products bearing the name "Bonnie" in various forms, but its only registration was for "Prox Bonnie Blue," a name used for a short time on blueing and then shortened to "Bonnie Blue." Defendant introduced a line of "Bonnie Brite" products; and when plaintiff sued for infringement, defendant argued that by dropping the word "Prox," plaintiff had abandoned its registered mark. The Court held that:

> The plaintiff and its predecessors have consistently used the mark BONNIE BLUE or BONNIE since 1938, and there thus appears to be a continuous intent to have the mark BONNIE identify its goods. Abandonment will not usually be inferred in the absence of intent to abandon. * * * Thus the dropping of the word PROX under these circumstances did not work an abandonment of plaintiff's trademark. [206 F. Supp. at 514].

Similarly, in Puritan Sportswear Corp. v. Shure, 307 F.Supp. 377 (W.D.Pa. 1969), one of the court's findings was that:

> Plaintiff's registration of the trademark "Puritan Sportswear, the Choice of All Americans" has entitled and does entitle plaintiff to the protection of the Lanham Act in connection with its modified use of that trademark wherein plaintiff has eliminated all words but the word "Puritan", and said modified use constitutes no intentional abandonment of the original trademark. [307 F.Supp. at 389].

Defendant attempts to distinguish those cases by noting that they involved a modification of the registrant's own mark, whereas here the plaintiff's mark was conceived of independently, before plaintiff had any knowledge of Eichler's. But the distinction is immaterial. By purchasing Eichler's mark, plaintiff acquired any rights that Eichler might have had; and if Eichler could have substituted plaintiff's mark for his own without abandonment, plaintiff could do the same.

The Court therefore finds, on the issue of invalidity, that (1) there was insufficient evidence to justify a finding that the Eichler registration was either obtained or maintained fraudulently, and (2) neither Eichler nor plaintiff ever abandoned the mark. Plaintiff has a valid trademark registration. The next question is whether or not defendant was guilty of infringement.

*4. Infringement.*

15 U.S.C. § 1114 provides, in part, as follows:

> (1) Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive * * * shall be liable in a civil action by the registrant for the remedies hereinafter provided. * * *

RBS relies on two main defenses to the claim of infringement: first, that none of its marks [11] can be classified as a "reproduction, counterfeit, copy or colorable imitation" of the plaintiff's;[12]

---

11. Defendant uses a number of different marks. One consists solely in the words "The RED BARN." Another consists in the words "RED BARN" placed next to a simple outline of a barn in red. Yet another is composed of the same words superimposed on the outline, with a rising sun in the background.

12. Since the differences between the Eichler mark and plaintiff's own are insubstantial, a continuing distinction is unnecessary.

and second, that its use of those marks is not "likely to cause confusion, or to cause mistake, or to deceive."

Taken literally, neither defense is strictly applicable to the facts here. The physical similarities between plaintiff's mark and defendant's are such that if the other conditions of infringement were met, the Court would have no difficulty in finding "colorable imitation" as well. *Cf.* Coca-Cola Co. v. Cleo Syrup Corp., 48 F.Supp. 567 (E.D. Mo.1942).

As for the second defense, confusion clearly does exist. The evidence indicated that on numerous occasions, people called or visited LBR stores and asked for RBS products. Salesman contacted LRB under the mistaken impression that they were dealing with RBS; and on one occasion, a supplier almost cut off an LRB store's credit because of a report indicating that an RBS restaurant in the same area was delinquent in its sales tax payments. A random survey of four hundred residents of West Des Moines, Iowa, an area in which both of the parties are presently operating, revealed substantial confusion. Of the 268 persons who claimed to be familiar with both parties, 57 believed that there was some business connection between them, and 72 were unsure. Of the 296 who claimed to be familiar with the plaintiff and gave unambiguous answers to the question "What can you get there?", 128 named products sold only by the defendant.

However, the confusion which obviously exists is the product of plaintiff's own unprotected conduct, and not of any infringement by the defendant. When defendant opened its first restaurant in September, 1961, plaintiff was not even in existence. A trademark search made at that time would have revealed the Eichler registration, but Eichler's use of his mark was so limited, and on products differing so greatly from the defendant's, that infringement would have been out of the question.

The real source of the present confusion was plaintiff's entrance, after defendant's business was already established, into the convenience food business. More specifically, it was plaintiff's decision to market its products through a chain of drive-in stores resembling red barns. Plaintiff appears to assume that it had some special right to do so by virtue of the Eichler registration. That assumption is incorrect. True, a trademark can operate as a sword as well as a shield. If a product or service is close enough to the registered one that the registrant could prevent others from using his mark on it, the necessary implication is that the registrant himself has an exclusive right to use his mark on that product or service.

But that is not the case here. The similarity between Eichler's operation and that of the plaintiff was negligible. Eichler sold a narrow line of quasi-gourmet food items through a single store, which neither resembled nor bore the name of a red barn. Plaintiff sells a comparatively broad line of grocery items through a chain of distinctively designed drive-in stores. Plaintiff never sold most of the items listed in the Eichler registration at all; and the only trademarked product that plaintiff still manufactures under Eichler's recipe is whole wheat bread, an item which accounts for a relatively small percentage of plaintiff's total sales.

To hold that the Eichler registration gave plaintiff the right to enter a field as different as the convenience food market, and then sue an already established restaurant chain for infringement, would be tantamount to holding that a trademark registration is the equivalent of a reservation of name: that the registrant has an exclusive right to use his mark, not only on the products or services for which the mark is registered, but also on practically any other product or service that he might subsequently decide to deal in. The Court finds that defendant is not guilty of infringement within the meaning of 15 U.S.C. § 1114.

*Count II: Unfair Competition.*

 In Count II, plaintiff contends in substance that defendant's use of its name as a service mark to identify its restaurants infringes plaintiff's common law right, derived from Eichler, to use its own name as a service mark for convenience food stores. The Court is of the opinion that no such right ever existed.

The only use that Eichler ever made of his mark was as a trademark for the products he sold through the Milk Pail store. Plaintiff points to the fact that Eichler attempted to interest others in his idea of establishing a chain of Little Red Barn stores, but the fact remains that no such stores were ever built. In United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918), the Supreme Court made the following comment:

> There is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trademarks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; * * * and it is not the subject of property except in connection with an existing business.

The same applies to service marks. Mere plans confer no rights. It may be true that Eichler hoped someday to use his mark as a service mark for stores of a type similar to plaintiff's; but he never did, and in the face of defendant's prior use, plaintiff is in no position to complain of unfair competition.

 In its reply brief, plaintiff argues that even if Eichler never actually used his mark as a service mark, it was still so "arbitrary and distinctive" that defendant's use of a similar mark to identify its restaurants constituted unfair competition. At the outset, the Court rejects any suggestion that Eichler's mark was "distinctive." At the very most, it was "arbitrary," *cf.* Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609, 611 n. 2 (7th Cir. 1965); and a week arbitrary mark at that, because of the widespread use of the name by other enterprises in different fields.

But in any event, the business of operating a restaurant differed sufficiently from Eichler's business that defendant had every right to enter the restaurant field under the name "Red Barn." In United Drug Co. v. Theodore Rectanus Co., *supra*, 248 U.S. at 97–98, 39 S.Ct. at 51, the Supreme Court stated that "[t]he owner of a trademark may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly." That is precisely what plaintiff would have the Court approve here. Eichler had no right to bar anyone else from opening a Red Barn restaurant, and defendant's entrance into that field was entirely legitimate. Accordingly, the Court finds that defendant's use of the name "Red Barn" to identify its restaurants did not constitute unfair competition.

*Count III: False Marking.*

In Count III, plaintiff contends that defendant competed unfairly by using a circled "R", indicating a federal trademark registration, on some of its packages. Plaintiff cites three instances of alleged false marking, the first involving salt packages and the other two apparently involving food containers.[13]

The record is devoid of evidence concerning the circumstances under which

13. The containers themselves (if indeed they were containers) were not introduced into evidence. The only evidence concerning these latter items consisted in xerographic copies of unidentified originals which plaintiff appended to its op- position against defendant's first service mark application. From the shape, one of the two items appears to have been a paper cup. The Court can only speculate as to the other.

the marks were affixed to the last two, and the only evidence concerning the salt packages was the following explanation given by defendant's counsel in his opening statement:

Now, the people who package the salt and had the packages printed up made a mistake by putting the "R" on there, and frankly, defendant did not know it until it was brought to our attention by the plaintiff. Orders have gone out to all of our restaurants not to use those salt packages, to get another supply of salt. The supplier has been notified to destroy his printed stock of those salt packages and to reprint the packages without the "R" in a circle. It was just one of those things that happens quite frequently in the field of trademarks, where a printer or publicity man would erroneously us the "R" in a circle symbol when they should have known, or should have checked to see whether the mark was actually registered.

The Court has no reason to doubt that explanation; and in the absence of any evidence to the contrary, can only presume that the marks improperly affixed to the other items were applied under equally innocent circumstances.

But in any event, irrespective of intent, the rule in Indiana is that unless it seems probable that the public will be deceived by the defendant's conduct, that conduct does not constitute unfair competition. Hartzler v. Goshen Churn & Ladder Co., 55 Ind.App. 455, 104 N.E. 34 (1914). There the court made the following comment:

As in the case of the infringement of another's trademark, the true test of unfair competition is whether the acts of defendant are such as are calculated to deceive the ordinary buyer under the ordinary conditions which prevail in the particular trade to which the controversy relates. [104 N.E. at 38].

The Court is unable to conceive of any way in which the public might have been materially deceived, or the plaintiff damaged, by an improper application of the registration mark. In the first place, the mark is small and obscure; but even if it had been prominent, it still would have been of no significance, since whether or not a mark is registered is entirely immaterial to the average member of the public.

Consequently, the Court finds that defendant's use of the circled "R" did not constitute unfair competition.

*Count IV: Breach of Contract.*

In Count IV, plaintiff charges the defendant with breach of an agreement entered into by the parties on April 14, 1964. The pertinent provisions of that agreement are as follows:

WHEREAS, RBS is the owner of the service mark "THE RED BARN" and the application for Federal Registration thereof, Ser. No. 128,-589 filed September 25, 1961, which mark is used for promoting the establishment of a chain of franchised drive-in restaurants, and advising, instructing and financially assisting the operators of such restaurants; and

WHEREAS, LRB is the owner of the mark "LITTLE RED BARN", and is the owner of Federal Reg. No. 652,-818 [the Eichler registration] relative thereto, which mark is used for identifying various items of food enumerated in the Registration, which foods are sold through grocery stores and dairy stores of a drive-in type; and

WHEREAS, the parties are desirous of entering into this agreement in keeping with the offer of RBS of February 14, 1964, a copy of which is attached herewith, which offer is incorporated herein as a part of this agreement, and which offer has been accepted by LRB;

\* \* \* \* \* \*

3. RBS agrees that it will not use its service mark or any other mark embodying the words "RED BARN" as a trademark for the identification

and sale through grocery and drive-in dairy stores of foods of a type identical or similar to those foods enumerated in [the Eichler registration], or for operating such grocery or drive-in dairy stores. As used herein, "drive-in dairy stores" shall mean retail establishments selling foods for consumption off the premises.

4. LRB agrees that it will not use its trademark or any other mark embodying the words "RED BARN" as a service mark for promoting the establishment of a chain of franchised drive-in restaurants, and advising, instructing and financially assisting the operators of such restaurants, such restaurants being of a type identical or similar to those operated or which will be operated by RBS and those presently in operation which are serviced by RBS.

The offer of February 14, 1964, which was incorporated into the agreement, provided as follows:

In order to fully settle all matters of contention between us, we make the following offer:

1. In order to insure that the public does not become confused as to the ownership and management of Li'l Red Barn, Inc. and The Red Barn System, Inc., franchising operations, The Red Barn System, Inc., offers to meet and discuss the merits of a written agreement whereby it is insured that Li'l Red Barn and Red Barn System will not operate or franchise competitive establishments in the same market area.

2. Upon the execution of the written agreement referred to in the foregoing paragraph The Red Barn System, Inc. will pay to you the sum of $10,000.00 in consideration of your dismissing your Opposition No. 42,-948 now pending before the Trademark Trial and Appeal Board and The Red Barn System, Inc. will con-currently dismiss its Cancellation No. 7963 now pending before the Trademark Trial and Appeal Board.

Plaintiff's claim is that defendant violated paragraph 3 of the agreement by "emphasizing" the sale of carry-out fried chicken after 1964. Defendant does not admit having done so; but maintains that even if it did, there was no violation of the agreement. The Court agrees.

■ The evidence at trial indicated that defendant did increase its promotional emphasis on carry-out fried chicken after the execution of the agreement, but nothing in the agreement prevented it from doing so. In the first place, chicken of the sort sold by defendant is not, in the opinion of the Court, "of a type identical or similar" to any of the foods listed in the Eichler registration. The Eichler registration did include "small barbecued chicken," but the evidence indicated that the only chicken Eichler ever sold was frozen, and there was no evidence that Eichler ever sold ready-to-eat [14] foods under the Little Red Barn label. Defendant's chicken, on the other hand, was dismembered, fried on the premises, and dispensed to the customer in ready-to-eat form.

The express purpose of the agreement between LRB and RBS was to make sure that the two companies would not operate competitive establishments in the same market area. The words "identical or similar" should be interpreted in light of that purpose. In determining whether or not products are "identical or similar," the inquiry should be whether they appeal to the same market, not whether they resemble each other physically, or whether a word can be found that describes both. Defendant's chicken appeals to an entirely different market from the one served by Eichler, or indeed by the plaintiff. Defendant's customers are looking for a

---

14. By "ready-to-eat" as used here is meant *intended* to be eaten promptly. While Eichler did sell products capable of being eaten without further preparation, none were intended to be eaten immediately.

meal, to be consumed within a relatively short time, either on or off the defendant's premises. Plaintiff's customers are looking for groceries. By no stretch of the imagination could defendant's fried chicken be regarded as competitive with the frozen chicken sold by Eichler or the plaintiff; and for that reason, the two products should not be classified as "identical or similar."

Moreover, even if the products were similar, the agreement prohibits RBS from selling such products only "through grocery and drive-in dairy stores." Red Barn restaurants are neither. Plaintiff points to the last sentence of paragraph 3, which provides that "[a]s used herein, 'drive-in dairy stores' shall mean retail establishments selling foods for consumption off the premises." Since a substantial proportion of defendant's customers take their food off the premises before consuming it, plaintiff contends that defendant's restaurants fall within that definition of "drive-in dairy stores."

If the definition is read literally, defendant's restaurants do fit its terms. However, like any other provision, the definition should be read in light of the contract as a whole. Doing so, it becomes apparent that the language used was overbroad; and that to give it literal effect would be to frustrate the intent of the parties and to deny substantial justice.

First of all, the definition is patently inconsistent with the term it defines. It contains no reference either to drive-in facilities or to dairy products. Taken literally, the definition would include a candy store or a bagel bakery. Second, the broad reading sought by plaintiff seems inconsistent with the manner in which the term is used elsewhere in the contract. In the preface, plaintiff is described as operating "grocery stores and dairy stores of a drive-in type." Defendant is described as operating "drive-in restaurants." If a drive-in restaurant is a drive-in dairy store, why the distinction?

There is more than enough ambiguity on this point to permit the introduction of parol evidence; and when such evidence is considered, it becomes apparent that the definition relied on by plaintiff was intended to broaden defendant's rights, rather than to restrict them. The evidence at trial indicated that the language in question was inserted at the instance of the defendant. Defendant's officers were acquainted with a drive-in chain in Iowa which operated restaurants under the name of "dairy stores." Defendant was entirely willing to stay out of the convenience store business, but feared that without further definition, the term "drive-in dairy stores," as used in the agreement, might somehow be construed as preventing it from operating its restaurants. The definition was inserted in an abortive attempt to make it clear that "drive-in dairy stores" meant convenience stores, not restaurants. In fact, it failed abysmally, and indeed has now been urged as indicating the exact opposite of what it was intended to mean; but the intent of the parties was clear, and the Court will not permit plaintiff to take advantage of defendant's poor draftsmanship when the real meaning of the contract is apparent and the clause relied on by plaintiff is clearly inconsistent with the remainder of the agreement.

The Court finds that defendant's increased emphasis on carry-out fried chicken after 1964 was not in violation of the agreement, first, because carry-out chicken is not "identical or similar" to any of Eichler's products; and second, because defendant has not sold it through either grocery or drive-in dairy stores.

Although neither of the parties appears to have considered this matter, the contract between them remains in full force and effect, and provides an additional reason for denying plaintiff relief in Count I. The express purpose of the agreement was "to fully settle all matters of contention between us" by ensuring that the parties would not

"operate or franchise competitive establishments in the same market area." By entering into that agreement, plaintiff consented to defendant's use of its name in commerce, provided defendant refrained from selling products similar to Eichler's through grocery or drive-in dairy stores. And in doing so, plaintiff clearly estopped itself from claiming infringement so long as defendant lived up to its end of the bargain. *Cf.* Smith v. Dental Products Co., 140 F.2d 140, 148 (7th Cir. 1944); R. M. Hollingshead Corp. v. Davies-Young Soap Co., 121 F.2d 500, 503, 28 C.C.P.A. 1286 (1941). Defendant has done so, and the Court therefore finds that plaintiff is estopped from claiming infringement of the Eichler registration by defendant.

*Count V: Fraud on the Patent Office.*

■ At the end of its evidence, plaintiff asked leave to amend its complaint by adding a fifth count charging defendant with fraud on the Patent Office in the acquisition of its service mark registration. The claim is that defendant misled the trademark examiner by giving the impression that its only use of the mark "The RED BARN" was as a service mark identifying the services it rendered to franchisees, when in fact the mark was also being used by the franchisees as both a trademark and a service mark identifying their restaurant services. As relief under this count, plaintiff asks in the alternative that defendant's registration be cancelled or that plaintiff's opposition, dismissed as a result of the agreement discussed above, be reinstated in the Patent Office. The motion to amend is granted, but the requested relief is denied.

The facts relevant to this count are as follows. On September 25, 1961, defendant applied to have its mark registered as a service mark for the services of "promoting the establishment of a chain of franchised drive-in restaurants, and advising, instructing, and financially assisting the operators of such restaurants." At the time, defendant and its franchisees were also using the mark as a trademark and as a service mark for restaurant services.

Defendant's initial application was denied on the ground that its mark was sufficiently similar to two others (Eichler's being one of them) that confusion was likely. Defendant applied for reconsideration, arguing that its mark was used to identify services, whereas the others were used as trademarks for food products. The Examiner withdrew his objection because of possible confusion with the third mark, but reaffirmed his earlier refusal to register on the ground that defendant's mark conflicted with Eichler's. In the letter announcing his decision, the Examiner said that "[c]areful consideration has been given to applicant's contention that its mark is used only in connection with consultation services in establishing restaurants; however, the specimens indicate otherwise." Although the examiner failed to indicate which specimens he was referring to, one of them was an RBS letterhead depicting the "RED BARN" sign used by franchisees in front of their restaurants.

Defendant once again asked reconsideration, emphasizing the fact that the mark sought to be registered was addressed to prospective franchisees rather than members of the general public, and the Examiner capitulated. When the agreement between RBS and LRB was executed, and LRB dismissed its opposition, defendant's mark was registered.

Relying on the statement quoted above, plaintiff contends that the examiner would have refused registration had he not been misled into believing that defendant's mark was used solely as a means of identifying the services described in the application, and that defendant's failure to inform him otherwise constituted fraud.

While nothing in the Patent Office file indicates that the Examiner was ever expressly informed that defend-

ant's mark was being used as a trademark, he was informed of the fact that it was being used as a service mark by franchisees. In a letter responding to the Examiner's first refusal to register, defendant's counsel stated the following:

> While it is true that the restaurant operators use the words "RED BARN" as a mark to identify the services which each of them performs in conducting his own business (a use which might well support an application for registration of "RED BARN" for services other than those forming the basis of the present application), this application is directed to those services which are performed directly by the applicant, as described in the application. In this connection, it is well established that it is the identification of goods or services in an applicant's application which is controlling on the question of likelihood of confusion, rather than other goods and services, not described in the application, to which the mark may also be applied.

From this it seems clear that the examiner was on notice that the use described in the application was not the only use to which the mark was being put; and if, as his subsequent letter indicated, he understood otherwise, that misunderstanding was not the fault of the defendant.

In any case, the Court has difficulty in understanding the relevance of uses other than those described in the application. Defendant was only seeking registration for a specified set of services; and if the use of its mark on those particular services was not likely to create confusion, defendant was entitled to registration, regardless of the effects of its other, unprotected uses.

■ Consequently, the Court finds, first, that the defendant was not guilty of misrepresentation; and second, that even if it had been, the representation in question did not relate to a material fact. Finally, since the facts relied on

by the plaintiff now were either known or available to discovery in 1964, when plaintiff voluntarily dismissed its opposition in accordance with the terms of its settlement agreement with the defendant, plaintiff is estopped from resurrecting them at this late date, either in this Court or before the Patent Office.

*First Counterclaim: Invalidity of Eichler Registration.*

■ In the First Counterclaim, defendant seeks cancellation of the Eichler registration. As grounds for cancellation, defendant reasserts the same arguments made as defenses to the claim of infringement in Count I. In substance, defendant contends that the registration was acquired and maintained fraudulently; and in the alternative, that the mark was abandoned.

Since all of those claims were discussed in detail in connection with the disposition of Count I, an extended discussion is unnecessary here. It is sufficient to note that defendant has failed to sustain its burden of proof; and for that reason, cancellation is denied.

*Second Counterclaim: Infringement of Service Mark.*

In the Second Counterclaim, defendant contends that plaintiff's use of its mark to identify its services in selling franchises, etc., infringes defendant's registered service mark. Defendant's basic claim is that plaintiff has used its mark in such a way as to make confusion likely among prospective franchisees.

■ First of all, the Court is of the opinion that defendant is estopped from arguing infringement by its execution of the settlement agreement referred to above. Defendant does not contend that plaintiff has violated any of its obligations under the agreement; and if not, defendant no longer has any right to argue infringement. As was noted above, the express purpose of the agreement was "to fully settle all matters of contention" between the parties; and in-

fringement was clearly one of those matters.

 But even on the merits, relief would not be warranted. The allegedly infringing mark is directed towards a highly sophisticated market—investors interested in entrepreneurial enterprises. The process of buying a franchise is a protracted one, involving extended negotiations and a detailed appraisal by the prospective franchisee of the franchisor's business. Any possible confusion would be dispelled at a very early state, without injuring anyone.

Defendant introduced no evidence at all of actual confusion; and in fact, its evidence tended to indicate the contrary. On cross-examination, its former president, Richard Kearns, made the following remarks:

Q: Do you know of your own knowledge whether any one of the persons that you yourself have contacted for the purpose of purchasing a franchise from your organization, The Red Barn System, Inc., have ever thought they were buying the franchise of the plaintiff, Li'l' Red Barn, Inc.?

A: Never to my knowledge.

\* \* \* \* \* \*

Q: Do you of your own knowledge know of any damage that your company, while you were president, suffered due to the plaintiff's use of its mark?

A: I cannot say; no, sir, no.

In light of the circumstances surrounding the advertisement, promotion and sale of franchises in a field like the plaintiff's, the Court finds that confusion would be highly unlikely, and therefore concludes that plaintiff's use of its mark as a service mark identifying its services to prospective franchisees does not infringe defendant's registered service mark.

*Summary.*

The end result of this decision is to leave the parties in the *status quo ante.*

Each has a valid registration, but neither has been guilty of infringement; and in any event, both are estopped from claiming infringement by the settlement agreement entered into in 1964. Since neither party has breached that agreement, it remains in full force and effect, and controls their use of their respective marks.

The proceedings presently stayed in the Patent Office may be reopened or dismissed, as the parties choose; but their rights as against each other are controlled by the terms of their agreement.

This opinion shall constitute findings of fact and conclusions of law.