**BLUE BELL, INC., Plaintiff-Appellant,**

**v.**

**JAYMAR–RUBY, INC., Defendant-Appellee.**

**Nos. 752, 829, Dockets 73–2398, 73–2380.**

United States Court of Appeals, Second Circuit.

Argued April 15, 1974.

Decided May 17, 1974.

---

**434**

Walter D. Ames, Washington, D. C. (Watson, Cole, Grindle & Watson, Washington, D. C., Aaron B. Karas, New York City, of counsel), for plaintiff-appellant.

Robert M. Newbury, Chicago, Ill. (Pattishall, McAuliffe & Hofstetter, David C. Hilliard, Chicago, Ill. and Elihu Inselbuch, New York City, of counsel), for defendant-appellee.

Before KAUFMAN, Chief Judge, CLARK,* Associate Justice, and SMITH, Circuit Judge.

J. JOSEPH SMITH, Circuit Judge:

These are cross-appeals from an order of the United States District Court for the Southern District of New York, Whitman Knapp, Judge, dismissing plaintiff's trademark infringement action and defendant's counterclaim for attorneys' fees. We affirm although on grounds somewhat different from those of the district court.

## I. PLAINTIFF'S INFRINGEMENT ACTION

Plaintiff's contention that its "Jeanie" trademark on its women's sportswear is infringed by defendant's use of its "Jaymar" trademark on its men's slacks is without merit. We begin with the related questions of the similarity of, and likelihood of confusion between, the two marks—obviously the critical elements of an infringement action. Here we must agree with the dis-

---

* United States Supreme Court, retired, sitting by designation.

trict court that the possibility of such confusion is at most negligible.

Taking the two marks as a whole, Sleeper Lounge Co. v. Bell Manufacturing Co., 253 F.2d 720, 722 (9th Cir. 1958), it is obvious that "Jaymar" will not be mistaken for "Jeanie." Plaintiff argues, however, that the proper comparison is between the oversized "J's" which dominate both marks.[1] Assuming *arguendo* that plaintiff is correct, we nevertheless find that plaintiff's "J"—a rather gaunt affair with no top and a pointed tip (not unlike a fishhook)—is quite different from defendant's stylized version—a shorter, stouter, but rather calligraphic rendition with a top and a scrolled end. *Compare*, Application of Burndy Corp., 300 F.2d 938, 49 CCPA 967 (1962); Application of Anderson Electric Corp., 370 F.2d 593, 54 CCPA 931 (1967).

This initial finding of non-infringement—which we make independently of the district court—is buttressed by an absence of the other factors suggesting infringement.[2] *See*, Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir. 1961), cert. denied, 386 U.S. 820, 82 S.Ct. 36, 7 L.Ed. 2d 25 (1961). First, plaintiff's declining use of its "Jeanie" name demonstrates that it was far from a "strong" mark. While the trademark may have been more than merely descriptive of the clothing to which it was attached, it is doubtful that it had acquired a secondary meaning.[3] *See*, W. E. Bassett Co. v.

Revlon, Inc., 354 F.2d 868, 871 (2d Cir. 1966).

Second, we find that the proximity between the disputed lines (women's and men's sportswear) was only moderate and that there was no substantial evidence that either of the parties was likely to "bridge the gap." *See*, Hyde Park Clothes, Inc. v. Hyde Park Fashions, 204 F.2d 223, 224 (2d Cir. 1953), cert. denied, 346 U.S. 827, 74 S.Ct. 46, 98 L.Ed. 351 (1953). We realize that since *Hyde Park* was decided, men's and women's apparel has had a tendency to converge and that the Trademark Trial and Appeal Board has found the two lines sufficiently related in some registration proceedings.[4] But here there is no evidence that the two will ever conflict: According to its own officials, plaintiff has never contemplated extending the feminine "Jeanie" mark to its men's fashions, and it is clear that the defendant, which has never manufactured women's clothes, has no intention of doing so in the future. *See* King Research, Inc. v. Shulton, Inc., 454 F.2d 66, 68 (2d Cir. 1972).

Third, plaintiff has been unable to demonstrate any actual confusion between the two marks or a lack of sophistication on the part of the consuming public. While it is true that *actual* mistake is but an indicia of the critical factor of a *likelihood* of confusion, the fact remains that the price range and the fairly detailed purchasing process of the goods in question[5] further suggest that

---

1. While plaintiff's numerous exhibits clearly show that the oversized "J" dominated its advertising, it was nevertheless always followed by a smaller, but legible, "eanie."

2. We note that while we are entitled to make our own assessment of the likelihood of confusion, the trial court's factual findings as to the other relevant factors in this infringement claim are reviewable according to the normal "clearly erroneous" standard. Miss Universe, Inc. v. Patricelli, 408 F.2d 506, 509 (2d Cir. 1969).

3. Since we find the trademarks here to be non-infringing, it is unnecessary for us to determine whether the ultimate cessation in plaintiff's use of its "Jeanie" mark—togeth-

er with conflicting testimony as to possible future use—constitutes abandonment. *See* Huber Baking Co. v. Stroehmann Bros. Co., 252 F.2d 945, 956 (2d Cir. 1959); Guiding Eyes for the Blind, Inc. v. Guide Dog Foundation for the Blind, Inc., 384 F.2d 1016, 1017–1019, 55 CCPA 701 (1967); 15 U.S.C. § 1127.

4. David Crystal, Inc. v. Shelburne Shirt Co., Inc., 162 U.S.P.Q. 472, 473 (T.T.A.B.1969); Kayser-Roth Corp. v. Silver Knit Hosiery Mills, Inc., 168 U.S.P.Q. 318, 319 (T.T.A.B. 1970); In Re London-Aire, Inc., 171 U.S.P. Q. 701 (T.T.A.B.1971).

5. The price range for plaintiff's goods was $4.50 to $26.00; for defendant's, $20.00 to

it is unlikely that consumers will be misled.

Finally, there is no evidence that the defendant adopted or used its mark in bad faith. It is, of course, not uncommon for a trademark holder to emphasize the initial letter in its name.

In sum, we find that the trademarks at issue are clearly non-infringing and that plaintiff's action was properly dismissed.

## II. DEFENDANT'S COUNTERCLAIM FOR ATTORNEYS' FEES

█ Defendant's counterclaim for attorneys' fees rests on the allegation that plaintiff's "use" of its pointed-J mark was insufficient to support its registration. Defendant contends that it is entitled under § 38 of the Lanham Act to the expenses it incurred in defending itself from plaintiff's assertion of this invalid mark:

> Any person who shall procure registration in the Patent Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.

15 U.S.C. § 1120.

We cannot agree. First it should be noted that defendant's counterclaim goes only to the pointed-J mark in its unembellished form. There was ample evidence that plaintiff made extensive use of its various "Jeanie" marks before and after their registration. But since plaintiff's theory has been that the parties' unadorned "J's" conflict, it is fair to say that the pointed-J registration alone occasioned Jaymar's defense costs.

Here the evidence of use is far less compelling. At the time of its application, plaintiff—on advice of counsel[6]—submitted five tags bearing the pointed-J mark. The application stated:

> The trademark was first used October 26, 1961 and was first used in interstate commerce October 26, 1961 and is now in use in such commerce.

But internal memoranda make it clear that this "use" consisted of a token shipment of goods worth a few dollars to a cooperating company which immediately returned them to the plaintiff.[7] Plaintiff's files further indicate that the sole purpose of this interstate exercise was to satisfy the trademark laws.[8]

---

$35.00. Thus the purchases involved here—which presumably included personal examination and fitting of the sportswear—were far from the "casual" sales where a similar trademark can be most confusing.

6. It should be noted that plaintiff's counsel in this action was not involved in the initial registration.

7. "We want to ship a sample sportswear garment in a misses', little girls', and girls', carrying a ticket with just a big "J" on it. Can you print a couple of dozen of dummy tickets as you have done in the past, incorporating just the big "J" and send maybe a dozen to Ailene and let her ship three or four garments and send the balance to me to send to the patent attorneys. This sample shipment should be made to Premier Textile in New York."

\* \* \* \* \*

"Attached is the original of Premier Textile Company's invoice no. 227173 in the amount of $3.71. This shipment was made to register the Big "J" design. The goods will be returned to our New York office."

\* \* \* \* \*

"Joe: When these are received, would you please send them to me in the original package."

8. Correspondence between the Patent Office and plaintiff's attorneys suggest that the Patent Examiner was less than convinced by the samples:

"The nature of the tags submitted as specimens and the fact that nothing but the letter "J" is shown thereon, raises the question as to whether or not they represent duplicates of those actually affixed to the goods as shipped in interstate trade and sold to the purchasing public (the ultimate consumer)."

In response, plaintiff's former counsel appears to have drawn a fine line even finer:

"The illustrated mark also appears on the submitted labels which were in use at the time of filing the application, . . ."

■ In question then is whether this "use" was sufficient to support registration under the Lanham Act. 15 U.S.C. §§ 1051, 1127. We hold that it was not. It is true that a number of decisions have held that a minimal amount of interstate commerce—either a sale or transportation—will suffice.[9] But while these decisions accept minimal use primarily intended to satisfy the trademark laws, none of them endorses sham transactions exclusively designed to do so. Rather we find a clear line of decisions holding that the use must be *bona fide*, with token transactions accepted only where there is an accompanying intent to engage in continuing commercial use in the future.[10]

■ Plaintiff attempts to avoid the leading decision in this line, Phillips v. Hudnut, 49 App.D.C. 247, 263 F. 643, 644 (1920), on the grounds that it was decided prior to the definition of "use" in the Lanham Act.[11] But it is clear that neither this definition nor any other portion of the Act abrogated the fundamental rule that the law protects only the use, not mere adoption, of a trademark.[12] Indeed the specific definition of "use" in § 1127 suggests to us that Congress clearly intended to require some *bona fide* commercial utilization of a mark prior to its registration.

Here there was no such use. The "sale" was obviously contrived with the

9. Montgomery Ward & Co. v. Sears, Roebuck & Co., 49 F.2d 842, 844, 18 CCPA 1386 (1931) ; New England Duplicating Machine v. Mendes, 190 F.2d 415, 416–417 (1st Cir. 1951) ; Maternally Yours v. Your Maternity Shop, 234 F.2d 538, 542 (2d Cir. 1956) ; Drop Dead Co. v. S. C. Johnson & Son, 326 F.2d 87, 93–94 (9th Cir. 1963), cert. denied, 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964) ; Fort Howard Paper Co. v. Kimberly-Clark Corp., 390 F.2d 1015, 1016–1017, 55 CCPA 947 (1968), cert. denied, 393 U.S. 831, 89 S.Ct. 99, 21 L.Ed.2d 101 (1968) ; Mr. Donut of America, Inc. v. Mr. Donut, Inc., 418 F.2d 838, 840–841 (9th Cir. 1969) ; L'il Red Barn, Inc. v. Red Barn Systems, Inc., 322 F.Supp. 98, 102–105 (N.D.Ind. 1970) ; DeMert & Dougherty, Inc. v. Chesebrough-Pond's, Inc., 348 F.Supp. 1194, 1195–1198 (N.D.Ill., 1972). *See also*, Tudor Square Sportswear, Inc. v. Pop-op Corp., 160 U.S.P.Q. 50, 54 n. 3 (T.T.A.B.1968) (noting in dicta that a token sale is "a common practice employed to secure a federal registration.").

10. *See*, Phillips v. Hudnut, 49 App.D.C. 247, 263 F. 643, 644 (1920) ; Maternally Yours v. Your Maternity Shop, 234 F.2d 538, 542 (2d Cir. 1956) ; Fort Howard Paper Co. v. Kimberly-Clark Corp., 390 F.2d 1015, 1017, 55 CCPA 947 (1968), cert. denied, 393 U.S. 831, 89 S.Ct. 99, 21 L.Ed.2d 101 (1968) ; In Re Beatrice Foods Co., 429 F.2d 466, 473 (Cust. & Pat.App.1970) ; Community of Roquefort v. Santo, 443 F.2d 1196, 1199–1200, 58 CCPA 1303 (1971) ; L'il Red Barn, Inc. v. Red Barn Systems, Inc., 322 F.Supp. 98, 102–105 (N.D.Ind.1970) ; State of Florida v. Real Juices, Inc., 330 F.Supp. 428, 433 (M.D.Fla.1971) ; DeMert & Dougherty, Inc. v. Chesebrough-Pond's, Inc., 348 F.Supp. 1194, 1196 (N.D.Ill., 1972) ; Black Panther

Co., Inc. v. Godfrey L. Cabot, Inc., 121 U.S. P.Q. 533, 534 (T.T.A.B.1959). *See also*, La Societe Anonyme des Parfumes le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1273–1274 (2d Cir. 1974).

The leading commentators agree. *See* 3 R. Callmann, Unfair Competition, Trademarks and Monopolies 292–93 (3d ed. 1969) ; E. Vandenburgh, Trademark Law and Procedure 25–27 (2d ed. 1968) ; 1 J. T. McCarthy, Trademarks and Unfair Competition 725–27 (1973).

11. "For the purposes of this chapter a mark shall be deemed to be used in commerce (a) on goods when it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto and the goods are sold or transported in commerce and (b) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in this and a foreign country and the person rendering the services is engaged in commerce in connection therewith."
15 U.S.C. § 1127.

12. *See* Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 413, 36 S.Ct. 357, 60 L.Ed. 713 (1916) ; Olin Mathieson Chemical Corp. v. Western States C & M Co., 227 F.2d 728, 730 (10th Cir. 1955), cert. denied, 351 U.S. 937, 76 S.Ct. 833, 100 L.Ed. 1464 (1955) ; Tillamook County Cream Ass'n v. Tillamook Cheese & Dairy Ass'n, 345 F.2d 158, 160 (9th Cir. 1965), cert. denied, 382 U.S. 903, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965) ; Mine Safety Appliances Co. v. Electric Storage Battery Co., 405 F.2d 901, 904 (Cust. & Pat. App.1969).

goods immediately returned to the plaintiff. And while plaintiff undoubtedly intended to use its "Jeanie" marks—and in fact did so—there is no evidence that it similarly intended to utilize the pointed-J mark alone. We hold, therefore, that plaintiff's application was false in that the "use" it alleged was legally insufficient.

Despite a similar finding, the district court held that this degree of falsity did not justify the award of attorneys' fees as there was no further proof of fraudulent intent. While we entertain some doubt about this reading of § 1120's "false *or* fraudulent" requirement as "false *and* fraudulent,"[13] we nevertheless conclude for different reasons that in this particular case, the exceptional "damages" of attorneys' fees are not recoverable.

We begin with two decisions in this circuit that attorneys' fees may be recovered under § 1120. Academy Award Products v. Bulova Watch Co., 129 F. Supp. 780 (S.D.N.Y.1955), aff'd, 233 F. 2d 449 (2d Cir. 1956); Merry Hull & Co. v. Hi-Line Co., 243 F.Supp. 45, 56–57 (S.D.N.Y.1965). However, these decisions preceded the Supreme Court's denial of attorneys' fees in the related context of trademark infringement actions. Fleischmann Distilling Corp. v. Maier

Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967).

In *Fleischmann* the Court began by restating the general American rule that "attorney's fees are not ordinarily recoverable in the absence of a statute or enforceable contract" so providing. 386 U.S. 714, 717, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475. After noting that there are equitable exceptions to the rule, the Court stressed the comprehensive nature of § 35 of the Lanham Act:

> The recognized exceptions to the general rule were not, however, developed in the context of statutory causes of action for which the legislature had prescribed intricate remedies. Trademark actions under the Lanham Act do occur in such a setting. For, in the Lanham Act, Congress meticulously detailed the remedies available to a plaintiff who proves that his valid trademark has been infringed.

386 U.S. 714, 719, 87 S.Ct. 1404, 1408, 18 L.Ed.2d 475.

The Court buttressed this all-inclusive view of § 35 by contrasting the explicit authorization of attorneys' fees in patent, copyright, and a number of other federal actions [14] with the several unsuccessful attempts to introduce such a provision into the Trademark Act.[15] 386

---

13. It is true that the Supreme Court has noted that "the word 'or' is often used as a careless substitute for the word 'and' . . ." and has therefore rewritten statutes where necessary to avoid obvious contradiction and to effectuate congressional intent. *See* DeSylva v. Ballentine, 351 U.S. 570, 573–580, 76 S.Ct. 974, 976, 100 L.Ed. 1415 (1956).

Here, however, we have neither such apparent contradiction nor any evidence suggesting that Congress did not intend to use the disjunctive precisely as it did. Rather we find that the few courts which have considered the issue have upheld the disjunctive interpretation. *See*, Simmonds Aerocessories v. Elastic Stop Nut Co., 158 F.Supp. 277, 278 (D.N.J.1958); Schwinn Bicycle Co. v. Murray Ohio Manufacturing Co., 339 F. Supp. 973, 984 (M.D.Tenn.1971), aff'd, 470 F.2d 975 (6th Cir. 1972); DeMert & Dougherty, Inc. v. Chesebrough-Pond's, Inc., 348 F.Supp. 1194, 1196 (N.D.Ill.1972). *See*

*also*, 2 J. T. McCarthy, Trademarks and Unfair Competition 414 (1973). It should be noted that *Schwinn* and *DeMert* nevertheless deny relief on the grounds that the trademark holder did not *know* his application to be false. Since we hold that plaintiff's conduct here could not justify the award of attorneys' fees in any event, it is unnecessary for us to pursue further this difficult question of scienter.

14. *See* 35 U.S.C. § 285 (patent actions); 17 U.S.C. § 116 (copyright actions); 386 U.S. 714, 721 n. 17, 87 S.Ct. 1404, 1408, 18 L.Ed. 2d 475 (1967).

15. There has been a certain vindication of the Court's reading by the fact that since *Fleischmann*, Congress has continued to refuse to authorize the award of attorneys' fees in infringement actions. *See*, S. 647, 92nd Cong., 1st Sess. § 5 (1971); S. 1362, 93rd Cong., 1st Sess. § 5 (1973).

U.S. 714, 721, 87 S.Ct. 1404, 1408, 18 L. Ed.2d 475.

It is true that *Fleischmann* is limited by its terms to infringement actions under § 35, while here we have an action under § 38 arising out of the use of a falsely obtained registration. Nevertheless, our review of the cryptic legislative history of § 38 convinces us that an implication of authorization for the extraordinary remedy of attorneys' fees would be equally unwarranted.[16]

Given this absence of statutory authorization, we believe defendant's counterclaim was properly dismissed.[17] This is not to say that defense expenses can never be awarded in an action involving a false registration. One can conceive of a case where an absolutely false registration was fraudulently obtained *solely* for the purpose of instituting completely vexatious litigation.[18] Indeed such were nearly the facts in Academy Award Products Co. v. Bulova Watch Co., 129 F.Supp. 780, 782–783 (S.D.N.Y.1955), aff'd, 233 F.2d 449 (2d Cir. 1956). In such a case, attorneys' fees might be awarded as a matter of equity quite apart from § 38. *See*, Vaughan v. Atkinson 369 U.S. 527, 530–531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); Fleischmann v. Maier Brewing Co., 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); Newman v. Piggie Park Enterprises, 390 U.S. 400, 402 n. 4, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); 6 J. Moore, Federal Practice ¶ 54.77[2], p. 1709 (2d ed. 1972).

But this is not such a case. While it is true that there is little merit in plaintiff's infringement claim and that its registration was technically false, the fact remains that it validly registered and used its "Jeanie" trademark in good faith for a number of years. Thus, while plaintiff may have been guilty of overreaching in registering the pointed-J mark, there is no suggestion that it did so solely for the purpose of bringing vexatious litigation almost ten years later. Defendant's counterclaim was properly dismissed.

Affirmed.

---

16. The brief committee report makes no mention of § 38 or the possibility of an action based on an improperly obtained registration. *See*, S.Rep.No.1333 (79th Cong., 2d Sess.), 1946 U.S.Code Congressional Service pp. 1274–1278.

Moreover, while the dissent in *Fleischmann* could point to the fact that attorneys' fees had been awarded in infringement actions prior to the Lanham Act, Aladdin Mfg. Co. v. Mantle Lamp Co., 116 F.2d 708, 717 (7th Cir. 1941), as suggesting that Congress did not intend to overrule the practice *sub silentio*, 386 U.S. 714, 722–723, 87 S.Ct. 1404, 18 L.Ed.2d 475 (Stewart, J., dissenting), there was no corresponding history of awards in false registration cases. The only case cited by the leading treatise on pre-Lanham Act law as awarding damages under § 25 of the 1905 Act, the predecessor to § 1120—Walworth Co. v. Moore Drop Forging Co., 19 F.2d 496 (1st Cir. 1927)—makes no mention of attorneys' fees. *See*, II. Nims, The Law of Unfair Competition 822–23 (4th ed. 1947).

17. In reaching this conclusion, we are not unmindful of the fact that since *Fleischmann*, the Supreme Court has twice upheld the award of attorneys' fees in actions based on federal statutes which did not specifically authorize such recovery. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 389–397, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (§ 14 [a] of the 1934 Securities Act); Hall v. Cole, 412 U.S. 1, 4–15, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973) (§ 102 of the Labor-Management Reporting and Disclosure Act).

However, both of these decisions distinguished *Fleischmann* on the grounds that the statutes at issue were less comprehensive than the Lanham Act. Moreover, both cases involved the "common fund" exception to the rule against attorneys' fees in that the plaintiffs were also vindicating the rights of others. Here such is not the case.

18. *Compare*, Electrical Information Publications v. C-M Periodicals, 163 U.S.P.Q. 624 (N.D.Ill.1969) (awarding attorneys' fees without mention of *Fleischmann* in a case involving serious fraud and clearly vexatious litigation).