**PROGRAMMED TAX SYSTEMS, INC., Plaintiff,**

v.

**RAYTHEON COMPANY and Raytheon Data Systems Company, Defendants.**

**No. 76 Civ. 432 (CHT).**

United States District Court, S. D. New York.

Sept. 27, 1976.

the action the facts so specified shall be deemed established.

Kaufmann & Kligfeld, New York City, for plaintiff; Jay W. Kaufmann, New York City, James Brewslow, Glen Rock, of counsel.

Kenyon & Kenyon, Reilly, Carr & Chapin, New York City, for defendants; Richard A. Huettner, Albert J. Breneisen, Michael J. Lennon, New York City, of counsel.

## MEMORANDUM

TENNEY, District Judge.

Plaintiff Programmed Tax Systems, Inc. has moved pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction prohibiting defendants Raytheon Company and Raytheon Data Systems Company from using the initials "PTS" in conjunction with the advertising, production or sale of Raytheon products.

For the reasons stated below, plaintiff's motion is denied.

Plaintiff Programmed Tax Systems, Inc. ("P.T.S.") is a New York corporation with its principal office in Mineola, New York. It was founded in 1968 and provided its first services in January 1969. The majority of its business consists in the computerized preparation of income tax forms, which is accomplished in the following manner. Accountants and attorneys, as clients of P.T.S., provide plaintiff with "raw taxpayer information" which is processed through a computer which P.T.S. programs and on which it rents time. The resulting computer tape is transformed into printed federal, state and city income tax return forms and schedules on machines owned and operated by P.T.S. (Kanofsky Deposition at 17, 39–47). P.T.S. also provides a general computerized bookkeeping service for accountants. In its fiscal year ended May 31, 1975 P.T.S.'s gross income was $1,600,099, an increase of $200,000 from the previous year. Most of this income is attributable to its computerized tax service. (Kanofsky Deposition at 169–74).

Defendant Raytheon Company ("Raytheon") is a highly diversified organization having annual sales in excess of $2 billion in 1975. Raytheon Data Systems, a division of Raytheon Company, is a supplier of equipment in the data processing field. Its sales are currently in excess of $50 million annually. (Levi Affidavit ¶¶ 2–3). As part of its intelligent terminal product line, Raytheon Data Systems offers two models designated "PTS–100" and "PTS–1200". These systems feature an intelligent terminal whose keyboard functions are programmed by the purchaser. The PTS–100 system is used by airlines and motel chains to make reservations and by stock brokers on the Midwest Stock Exchange for the input and output of exchange data. The PTS–1200 has the added capacity to store data files locally. (Levi Affidavit ¶¶ 4–9).

Plaintiff P.T.S. has brought this action under the Trademark Act of 1946, 15 U.S.C. §§ 1051–1127. It alleges that the defendant has made use of plaintiff's registered

trademarks "P.T.S." [1] and "PTS [design]," [2] that such use is likely to cause confusion in the mind of the public and will damage the value of plaintiff's trademarks and good-will. In its complaint, filed January 27, 1976, plaintiff asked for a permanent injunction against the use of the trademarks, an accounting by defendant for all profits and damages sustained by reason of the alleged infringement, destruction of all labels, etc., which would violate the injunction, and damages in the amount of $1,000,-000. By its notice of motion of April 10, 1976, plaintiff asks this Court to issue a preliminary injunction, presumably of the same substance as the permanent injunction requested in the complaint.

The test which must be satisfied by a party requesting a preliminary injunction in a trademark case was set out by the United States Court of Appeals for the Second Circuit in *Charlie's Girls, Inc. v. Revlon, Inc.,* 483 F.2d 953, 954 (2d Cir. 1973) (per curiam):

> "One moving for a preliminary injunction assumes the burden of demonstrating either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor."

Under either of these alternative tests it is necessary for the Court to examine to a limited extent the merits of the claim of infringement and then to combine its conclusions with a consideration of the impact which the Court's decision would have on the parties.

The criteria to be used in this Circuit in evaluating the merits of plaintiff's claim were set forth by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961):

"[T]he prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this exhaustive catalogue does not exhaust the possibilities—the court may have to take still other variables into account."

*See Blue Bell, Inc. v. Jaymar-Ruby, Inc.,* 497 F.2d 433, 435 (2d Cir. 1974); *King Research, Inc. v. Shulton, Inc.,* 454 F.2d 66, 68 (2d Cir. 1972).

Evaluating the plaintiff's claim against these criteria, the Court finds considerable doubt over the strength of that claim. Plaintiff's two registered marks, "P.T.S." and "PTS [design]," are not strong marks. Combinations of letters of the alphabet are readily available for use by anyone and are merely descriptive. *American Optical Corp. v. American Olean Tile Co., Inc.,* 185 U.S.P.Q. 405, 409 (S.D.N.Y.1974). Certainly the use of "PTS" has not been exclusive with the plaintiff. The *Acronyms and Initialisms Dictionary* [3] lists nine separate uses of the initials "PTS" in various fields, one of which is "Programmable Terminal System (Aviation)," a use very close to that of defendant Raytheon (see below). The United States Patent Office has issued two trademarks, other than those of the plaintiff, using the initials "PTS" (one of these is now cancelled) and has two applications pending, other than that of the defendant. (Sharkansky Affidavit ¶ 3). In the New York metropolitan area itself, where the plaintiff's business is concentrated (*see* Horowitz Deposition at 48–49), there is a "PTS Data, Inc.," which does computer data prep-

1. This mark consists of the capital letters "P.T.S." separated by periods. It was registered by the United States Patent Office on January 13, 1970.

2. This mark consists of a "fanciful representation of the letters 'PTS'" (U.S. Patent Office

Principal Register 890,283) in which the top bar of the "T" extends over the other two letters. It was registered on April 28, 1970.

3. *Acronyms and Initialisms Dictionary* 466 (4th ed. E. Crowley & R. Thomas).

aration and of which the plaintiff has been aware for three to five years. (Horowitz Deposition at 83–84).

While there is a great deal of similarity between the plaintiff's and defendant's marks, there are differences as well. Plaintiff uses "P.T.S.," with periods interspersed, or a distinctive design which uses the letters without the periods. Defendant uses "PTS" without periods and in conjunction with model numbers to designate certain computer systems. Defendant always prominently displays the name "Raytheon" in its advertisements and on the nameplates affixed to the "PTS" series of computers. (Levi Affidavit, Exhibits B–D; Backer Affidavit, Exhibits B–D; Kanofsky Affidavit, Exhibit 3).

The plaintiff's and defendant's products are essentially dissimilar. Plaintiff offers a service in which raw financial data is transformed into finished tax returns through the use of equipment owned or rented by the plaintiff and computer programs designed by the plaintiff. This service is sold primarily to accountants and law firms. Defendant, on the other hand, sells actual computer equipment directly to the customer, who must supply his own program and run the computer himself. Defendant's customers are a widely diverse set of companies; defendant claims never to have sold a PTS–100 or PTS–1200 computer to an accounting firm or a law firm or to anyone engaged in the preparation of income tax forms. (Levi Affidavit ¶ 5). Although plaintiff contends that Raytheon has the capability to enter the tax preparation field with its PTS series of computers (Kanofsky Affidavit at 5), it appears that Raytheon has made no attempt to do so. A comprehensive list of the possible functions of the more versatile PTS–1200 system makes no mention of tax or tax preparation. (Kanofsky Affidavit, Exhibit 3).

Even if the substantial difference between the two products is not initially apparent to a potential purchaser, that difference would become readily apparent to anyone who attempted to purchase a PTS series computer from Raytheon. The role of the purchasing process in the perception of product differences should be considered by the Court. See Blue Bell, Inc. v. Jaymar Ruby, Inc., 497 F.2d 433, 435–36 (2d Cir. 1974). The purchase of the Raytheon computer involves between three and six months of negotiations between Raytheon and an agent of the purchaser, generally the person in charge of the purchaser's data processing group. (Levi Affidavit ¶ 14). Furthermore, the purchasers of Raytheon's product are highly sophisticated and not likely to be confused as to the product they are purchasing. Even if they were initially confused, months of negotiation and purchase prices which begin at $6,000, as well as the differences in the product discussed above, should set right any misperception. Similarly, plaintiff's customers, accountants and attorneys, are also sophisticated purchasers.

Considering the other relevant factors, it would appear that defendant Raytheon acted in good faith in adopting its PTS designation and that the quality of its product is quite high. Defendant states that it has used the letters "PTS" in connection with its intelligent terminal systems since 1971, when the letters were chosen as the first initials of "Programmable Terminal System." (Backer Affidavit ¶ 2). Defendant applied for a trademark for "PTS–100" on or about April 8, 1975, some nine months before the commencement of this litigation. (Sharkansky Affidavit ¶ 7). On March 30, 1976, the United States Patent Office ruled that defendant's "PTS–100" mark was entitled to registration, having found on July 16, 1975 that

"[a] search of the Office records fails to show that the mark, when applied to applicant's goods and/or services, so resembles any registered mark as to be likely to cause confusion, or to cause mistake, or to deceive." (Sharkansky Affidavit, Exhibit B).

As discussed above, Raytheon clearly identifies its PTS series as coming from Raytheon, thus negating any possible allegation that it is attempting to palm off its products as those of plaintiff or of any other

company. Since the Fall of 1972, sales of the PTS–100 and PTS–1200 systems have been in excess of $60 million; defendant Raytheon has spent more than $1 million in advertising these products. (Levi Affidavit ¶ ¶ 11–12).

It is also unlikely that plaintiff will bridge the gap between the service which it offers and the product which defendant sells. While plaintiff does own some computer-related equipment, it has never produced such equipment and lacks the capacity to do so, its 25-person staff consisting primarily of salesmen (some of whom are accountants) and computer programmers. (Kanofsky Deposition at 30, 49–50).

Finally, plaintiff has alleged actual confusion on the part of four of its customers over the nature of Raytheon's PTS system and any connection with plaintiff. (Kanofsky Affidavit at 7). Even assuming such confusion to exist, it cannot offset the substantial problems with plaintiff's claim of infringement as discussed above.

Having concluded that the plaintiff's case has little likelihood of success on the merits, this Court need not spend much time discussing the elements of irreparable injury or the balancing of hardships. It is doubtful that the goodwill established by plaintiff will be harmed by any imagined connection with a company of the defendant's stature especially when that connection will be dispelled when any customer or potential customer actually contacts the defendant. If the plaintiff is able to establish at trial that it suffered any monetary loss from the alleged infringement, it is certain that defendant will be able to respond in damages. It appears, however, that such loss may be difficult to prove since plaintiff's income has risen in the past two years. (Kanofsky Deposition at 161–62, 169). Plaintiff has not alleged any specific instances of loss attributable to defendant's activities. Moreover, when hardships are balanced, the balance tips decidedly toward the defendant. Raytheon has spent over $1 million in advertising its PTS systems. If it were ordered to cease using the PTS designation, it would lose the customer recognition it

has built, giving the impression that the line had been discontinued and leading the public to believe that any superceding product name designated a new and unproven product. Against this loss is balanced the absence of a threat of irreparable injury to the plaintiff.

One further ground weighs against the granting of a preliminary injunction in this case. As Judge Weinfeld stated in denying a preliminary injunction in *Le Cordon Bleu S.a.r.l. v. BPC Publishing, Ltd.,* 327 F.Supp. 267, 271 (S.D.N.Y.1971), "[a] party who contends alleged infringement of its trademark rights . . . must move expeditiously to enjoin the conduct which allegedly results in irreparable injury." In *Le Cordon Bleu,* the plaintiff waited some 13 weeks after defendant commenced its allegedly infringing course of action before requesting a preliminary injunction. Here, defendant Raytheon introduced its PTS–100 model in the Fall of 1972, although the plaintiff states that it did not learn of defendant's activities until December 1, 1975. (Kanofsky Affidavit at 8). Yet, the complaint, which was filed on January 27, 1976, requested only permanent injunctive relief. Plaintiff's notice of motion for a preliminary injunction was not made until April 10, 1976, more than four months after plaintiff had first learned of the alleged infringement, ten weeks after the action was commenced and over three years after defendant began using the PTS designation. Such a delay evidences a lack of irreparable injury and constitutes a separate ground on which the extraordinary equitable relief now requested by the plaintiff should be denied.

For the reasons stated above, the plaintiff's motion for a preliminary injunction is denied.

So ordered.