S. Despertt
Paper No. 80

FOR PUBLICATION IN FULL

U. S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

Trademark Trial and Appeal Board

The NutraSweet Company by change of name from
G. D. Searle & Co.
v.
K & S Foods, Inc.

Opposition No. 67,903 to application Serial No. 322,385, filed
August 5, 1981

Mark I. Feldman, Diane Fields Geocaris and John J. McDonnell for
The NutraSweet Company.

B. J. Powell, for K & S Foods, Inc.

Before Rooney, Krugman and Cissel, Members.

Opinion by Krugman, Member:

K & S Foods, Inc. has applied to register NUTRA SALT (SALT
disclaimed) as a trademark for salt with trace minerals.[1]

Registration has been opposed by The NutraSweet Company,
formerly G. D. Searle & Co.[2]  As grounds for opposition, opposer

---

[1] Application Serial No. 322,385 filed August 5, 1981.

[2] While no request to substitute has been filed, the record shows
that the name of G. D. Searle & Co. was changed to The NutraSweet
Company and that the change of name was recorded in the Assignment
Division of the Office and indexed against all of opposer's
registered marks.  Since no dispute exists as to the facts and
circumstances surrounding this change of name, the NutraSweet
Company is hereby substituted as party plaintiff herein to reflect
opposer's name change.

asserts that it is the owner of the registered mark NUTRA-SWEET for a chemical compound used as a sweetening ingredient in the manufacture of food products and beverages;[3] that it has continuously used its mark in various forms such as NUTRASWEET, NUTRA-SWEET and NUTRA SWEET in connection with sweeteners used as ingredients for food products since prior to the date of first use alleged by applicant and that applicant's mark so resembles opposer's previously used and registered mark as to be likely, when applied to applicant's goods, to cause confusion, mistake or to deceive. Opposer further alleges, by way of an amended opposition, that registration should be refused because applicant has failed to use its mark in interstate commerce and/or that applicant has abandoned use of its mark.

Applicant, in its answer to the opposition, has denied the allegations therein.

The record consists of the pleadings, the file of applicant's application, a status and title copy of opposer's pleaded registration relied on by opposer,[4] applicant's answers to opposer's interrogatories relied on by opposer, portions of a discovery deposition of Mr. T. E. Stivers, applicant's executive vice president, relied on by opposer and testimony taken by both parties. Each party has filed a brief on the case and opposer has filed a reply brief. No oral hearing was requested.

---

[3] Registration No. 1,262,746 issued January 3, 1984.

[4] While the mark as registered was NUTRA-SWEET, the mark was amended on June 5, 1984 to NUTRASWEET.

Prior to the commencement of testimony periods, opposer moved for summary judgment on the ground that applicant's application was void ab initio for the reason that applicant's mark had not been used in commerce at the time the application was filed. The Board, in a ruling mailed January 4, 1985, held that genuine issues of material fact existed which precluded summary disposition of the case and the motion for summary judgment was denied. The Board, however, determined that no genuine issues of fact were in dispute as to opposer's standing to raise this issue and granted partial summary judgment in favor of opposer on the issue of standing.

We turn first to the question of nonuse and/or abandonment since if it is determined that the mark sought to be registered was not used at the time the application was filed, the application must be held void ab initio regardless of our determination of the question of likelihood of confusion. Similarly, if we determine that the mark was used as of the application filing date but was subsequently abandoned, registration must be refused regardless of whether we find likelihood of confusion from the contemporaneous use of the respective marks.

Turning to the facts and circumstances surrounding applicant's use of the mark NUTRA SALT sought to be registered, the testimony shows that on May 29, 1981, T. E. Stivers, applicant's executive vice president located in Georgia, shipped one jar of salt with trace minerals bearing the NUTRA SALT

3

trademark to Dr. Hilard Kravitz, applicant's president, located in California.[5] There was no charge made in connection with this shipment and no indication that any payment was made. Mr. Stivers testified that the label was made up for this shipment by taking a label for SUPER SALT, another trademark of applicant not involved herein used by applicant in connection with salt with trace minerals, blanking out the word SUPER and inserting the term NUTRA in its place. In response to a question asking whether the purpose of the May 29, 1981 shipment was to establish a date of use to support the trademark application, Mr. Stivers responded that the shipment was to get him (Kravitz) something that he could show to anybody he wanted to and develop business on the west coast. Stivers further testified that it was their understanding from their attorney that they had to ship something across state lines in order to qualify for the trademark. It further appears from the Stivers testimony that two jars of the product were made up with NUTRA SALT labels on May 29, 1981 with one jar's being shipped and the other's being kept in Georgia. The testimony states that Kravitz received the jar on June 2, 1981.

---

[5] Mr. Stivers testified that applicant's name K & S Foods, Inc. is derived from the names Kravitz and Stivers; that the corporation is owned by the wives of Kravitz and Stivers and that there are no salaried employees in the company, Messrs Kravitz and Stivers having done all the work of the company up to the present time.

4

The making up of the two jars of NUTRA SALT product and the shipment of one of those jars to Dr. Kravitz in California were the only activities in connection with the mark prior to the filing of the application on August 5, 1981. On August 23, 1981, twelve additional jars of the product were made up with the NUTRA SALT label and six of those jars were shipped to Dr. Kravitz.

Applicant claims continuous efforts have been made to market the NUTRA SALT product since June 1981. Stivers testified that hundreds of contacts have been made by Kravitz and Stivers in connection with the product, with personal friends and acquaintances, and that numerous sample jars have been given away. Much of the testimony concerning marketing efforts by applicant is of an indefinite nature. One portion of Stivers testimony concerning an alleged marketing contact between a specific entity named the Jewel Company and Dr. Kravitz was properly objected to as constituting inadmissible hearsay. Applicant did introduce into the record in connection with the Stivers deposition a price list of, inter alia, NUTRA SALT salt prepared in May, June or July 1983 and a fact list on the NUTRA SALT product prepared around the same time.

Stivers testified that while there may have been a sale of the NUTRA SALT product in 1983, the earliest documented sale was June 29, 1984. This was a sale of one case of the product in the amount of $12.00. Other sales in 1984 total five cases to three customers in the total amount of $60.00. Sales in 1985 up until the Stivers deposition in September 1985 total some 31 cases of NUTRA SALT product in the amount of $372.00.

5

No evidence exists as to any expenditure of money for any advertising or promotion of the product.

Section 1 of the Trademark Act states that:

"The owner of a trade mark used in commerce may register his mark ...." Section 45 of the Act states that a mark shall be deemed to be used in commerce when it is placed in any manner on the goods or their containers or on displays associated with the goods or on the tags and labels affixed thereto and the goods are sold or transported in commerce.

It is settled that a single sale or shipment in commerce may be sufficient to constitute use in commerce within the meaning of the Trademark Act provided that the sale or shipment was a bona fide commercial transaction and was accompanied by activities or circumstances tending to indicate a continuing effort to use and place the product on the market on a commercial scale. See: Avakoff v. Southern Pacific Co., 765 F.2d 1097, 226 USPQ 435 (Fed. Cir. 1985). The key element, as set forth by the Court of Appeals for the Federal Circuit, is that the initial transaction must not be a sham transaction and must be followed by a continuing effort or intent to engage in commercial use. See: ITT v. International Mobile Machines Corp., 800 F.2d 1119, 231 USPQ 142 (Fed. Cir. 1986) and cases cited therein. The ITT case, citing Blue Bell, Inc. v. Jaymar-Ruby, Inc., 497 F.2d 433, 182 USPQ 65 (2nd Cir. 1974), noted the existence of a line of decisions holding that a

minimal amount of interstate commerce primarily intended to satisfy the trademark laws is sufficient. However, none of the decisions endorses sham transactions exclusively designed to satisfy those laws. Rather, the use must be bona fide, with token transactions accepted where there is an accompanying intent to engage in subsequent continuing commercial use. The ITT case, reversing the Board's decision reported at 227 USPQ 713 (TTAB 1985), noted that a shipment was made to a director and investor in the company; that this person was interested in using the product (telephone system) in connection with a portable computer terminal in his insurance and financial planning business; that this person was interested in becoming a franchisee for the ULTRAPHONE telephone systems; that he used the product for a demonstration for others in Baltimore and that he used the product on trips to Philadelphia. The Court concluded that the Board decision holding that ITT met its burden of proving the registration invalid was clear error and the Board's decision was reversed.

In the present case, we believe the facts and circumstances surrounding the initial use of the NUTRA SALT product and the subsequent activities of applicant are of such a nature that the initial shipment cannot be considered a bona fide transaction. We think the import of the Stivers testimony is that the single shipment of the product from one corporate officer to

another was an intracompany transaction done solely for the purpose of qualifying for registration. The record shows applicant had a salt product and was attempting to see whether it should use SUPER SALT or NUTRA SALT as its trademark. The label prepared was simply a blocking off of a portion of the SUPER SALT mark and substituting the term NUTRA for the term SUPER. The testimony relating to the marketing efforts of applicant is vague, and nonspecific, with much emphasis being placed on samples shown to and distributed to unspecified friends and acquaintances. We find this testimony to be unpersuasive. No sales of the product were documented until June 1984, almost three years after the filing date of the application. While such a delay might not be unreasonable in connection with a product costing a great deal of money such as an airplane or large piece of specialized machinery, the product involved herein is salt, selling at $12.00 per case.

In short, looking at the total picture painted by the Stivers testimony, we do not believe the subsequent activities of applicant are of such nature as to warrant concluding that applicant was engaged in or intended to be engaged in a bona fide commercial activity at the time the application was filed. We conclude that the initial shipment from Stivers to Kravitz was nothing more than a sham transaction. Moreover, even if we found the initial transaction was an arm's length commercial transaction, we believe the subsequent activities of applicant,

8

that is, the vague, indefinite marketing efforts, the lack of any advertising of the product, the complete absence of any sales for some three years after the initial shipment and the relatively insignificant, sporadic sales of the product since that first sale, warrant the conclusion that the record fails to show a continuing effort or intent to continue use and market the product on a reasonable commercial scale within a reasonable time.  See: McCarthy, Trademarks and Unfair Competition, Section 19:37 (1984).

Under the circumstances, we agree with opposer that the application is void ab initio for the reason that the mark was not used in commerce prior to the application filing date.

While registration must be denied to applicant regardless of any decision on the issue of likelihood of confusion, we will nevertheless now rule on said issue in the interests of determining all issues properly before us in this case.

Opposer's priority in the NUTRASWEET mark has been established by competent testimony as well as by the introduction into evidence of status and title copies of a number of NUTRASWEET registrations.  With respect to the marks and goods involved herein, the record shows that opposer manufactures and sells an artificial sweetener used in connection with a wide variety of foods, including, carbonated soft drinks, cereal, chewing gum, milk additives, cocoa mix, desserts, powdered soft drinks, tea, chewable vitamins, topping mix and shake mixes.  In addition,

opposer manufactures and sells a tabletop artificial sweetener under the EQUAL trademark which contains the NUTRASWEET ingredient. The NUTRASWEET mark appears on the packaging of most of the products containing the sweetening ingredient and most of the companies using the NUTRASWEET ingredient in their products mention the NUTRASWEET mark by name in their advertisements. The mark always appears on the packets of applicant's EQUAL sweetener.

Opposer has enjoyed considerable success in the marketing of the NUTRASWEET product. The record shows that sales of the NUTRASWEET product for use in various other products and for use in the EQUAL tabletop sweetener average $558 million annually with the EQUAL sweetener containing the NUTRASWEET ingredient accounting for approximately $125 million per year. The EQUAL product is sold through retail grocery stores as well as to the food service industry and appears in restaurants as well as in other institutional settings. Opposer's vice president of marketing and grocery products operations, Mr. Timothy Healy, testified that during the twelve months preceding the taking of his deposition (July 1, 1985), opposer spent approximately $25 million in advertising the NUTRASWEET mark on television, radio, in magazines and the like. Mr. Healy further testified that, during the same period, companies using the NUTRASWEET ingredient in their products have spent approximately $243 million advertising their products and that the majority of these advertisements mention the NUTRASWEET ingredient by name.

Applicant, in its brief on the case, concedes that NUTRASWEET is a famous mark. It is applicant's contention, however, that no confusion is likely from the use of the respective marks on the goods for the reasons that the marks as a whole are distinguishable; that applicant's NUTRA SALT mark is always used as two separate terms with NUTRA appearing above the term SALT while opposer's NUTRASWEET mark is a single term; that the goods are different, opposer applying its mark to a food sweetening ingredient incorporated into other food products sold under different primary trademarks with the NUTRASWEET mark used as a secondary mark; that applicant's trade channels comprise the ultimate consumer while opposer markets its NUTRASWEET product to manufacturers; that many third parties utilize NUTRA as part of their trademarks for foods and additives for foods and that no instances of actual confusion have occurred.

We are satisfied from the record that NUTRASWEET is a well recognized trademark for an artificial sweetening ingredient. Opposer has testified to the results of studies showing that the NUTRASWEET mark enjoys a high degree of customer recognition and awareness. The record further shows that in addition to being incorporated in many varieties of products, the NUTRASWEET ingredient is used in opposer's own EQUAL artificial sweetener product and that both the marks EQUAL and NUTRASWEET are used on the package for the product and both marks are used in promoting

11

and advertising the product. While artificial sweeteners and salt with trace minerals are obviously different products, we think it likely that they would be sold in the same sections of grocery stores and supermarkets and would appear side by side in restaurants and on kitchen tabletops of ordinary consumers. We further note that the respective products are low-cost impulse-type items where the purchasing decision is not likely to be as careful as it would be with a higher-priced product.[6] In short, we conclude that the artificial sweetener and salt products are closely related, complementary products and that the use of the same or of a similar mark in connection with these products would likely result in confusion as to source or sponsorship.[7]

Turning to the marks, it is clear that both marks share the identical prefix NUTRA. While the respective suffixes SWEET and SALT are obviously different in appearance and sound, these

---

[6] Applicant introduced the testimony of a Mr. Arthur Montgomery, a retired Coca Cola bottling company executive who testified that the purchase of applicant's product is not an impulse type purchase. While applicant has characterized Mr. Montgomery as a disinterested third-party marketing expert, we agree with opposer that Mr. Montgomery has not been qualified as an expert in any area and that his testimony on this matter as well as on other matters relating to likelihood of confusion constitutes incompetent testimony entitled to no probative value whatsoever.

[7] We further note that opposer has shown that, beginning in the early 1970's, opposer has engaged in ongoing research in developing a salt substitute product.

12

suffixes comprise generic designations as applied to the respective goods and are devoid of any source indicating capacity. We think it quite likely that purchasers familiar with the NUTRASWEET product, either as an ingredient in EQUAL artificial sweetener or as an ingredient in various other food products, would, upon viewing NUTRA SALT salt with trace minerals, be likely to believe that this was a new product line put out by the same producer as the NUTRASWEET producer or that the salt product was somehow associated with or sponsored by the people producing the NUTRASWEET product.

Applicant's argument that its mark always is used in special form with NUTRA appearing above SALT is not persuasive if only for the reason that the mark sought to be registered, as shown in the drawing in the application, is not in special form but, rather, is simply a typed drawing showing the term NUTRA SALT.

Applicant's argument regarding third-party uses of marks containing the formative NUTRA is unsupported by any evidence. While applicant has made of record a few third-party registrations which include the term NUTRA, this is not evidence of use of these marks or evidence of the extent to which any of these marks have been in use. See, generally, Sams: Third Party Registrations in TTAB proceedings, 72 TMR 297 (1982). We note, moreover, that applicant itself indicated that the formative NUTRA has no

13

signifiance or meaning in applicant's relevant trade or industry.[8] Accordingly, we find the common formative NUTRA in the respective marks to be a strong element and nothing in the record is to the contrary.

Finally, while applicant has argued that there have been no instances of actual confusion, this fact is of no significance where, as here, applicant's sales have been de minimis and it is clear that there have been no opportunities for such confusion to arise.

In view of the foregoing, we find the respective marks to be sufficiently similar that their use on or in connection with the respective goods is likely to cause confusion for purposes of Section 2(d) of the Act.

Decision: The opposition is sustained and registration to applicant refused on the ground that the application is void ab initio in view of applicant's failure to use the mark in commerce at the time the application was filed and on the Section 2(d) ground of likelihood of confusion.

L. E. Rooney

G. D. Krugman

R. F. Cissel
Members, Trademark
Trial and Appeal Board

---

[8] Applicant's response filed September 28, 1982 to the Examining Attorney's March 24, 1982 Office action in connection with the ex parte prosecution of applicant's application.

14

OCT 2 3 1987